# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 05-1125

—————

United States of America,      \*
                                \*

        Plaintiff-Appellee,    \*

                                \*   Appeal from the United States

    v.                        \*   District Court for the District

                                \*   of Minnesota.

Valentine Onwubiko Obasi,   \*

                                \*

        Defendant-Appellant.   \*

—————

Submitted: September 15, 2005
Filed: January 19, 2006

—————

Before MURPHY, BRIGHT, and GRUENDER, Circuit Judges.

—————

MURPHY, Circuit Judge.

Valentine Onwubiko Obasi[1] was indicted for mail fraud, wire fraud, and money laundering and was convicted on thirty seven counts by a jury. The district court[2] sentenced him to 33 months and ordered restitution in the amount of $368,578.80. Obasi appeals, claiming that the denial of a portion of his request for investigative

———————————

[1]Appellant's name appears in this form in the case caption and the district court record, but counsel indicated in briefing and at oral argument that his name is actually Obasi Valentine.

[2]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

funds under the Criminal Justice Act (CJA) violated his constitutional rights, that the district court improperly admitted evidence of foreign bank records, and that the prosecutor committed misconduct in eliciting testimony about an absent investor. We affirm.

Obasi placed an advertisement in an insurance industry trade magazine to recruit agents to sell international mutual funds for Oval Financial and Investment Group, Ltd. (Oval). Oval claimed to be a worldwide fund management company that managed over $1 billion in funds and offered international mutual funds with guaranteed principal and minimum interest of ten percent. Insurance salesman Jeffrey Rodd responded to the advertisement and signed an agency agreement with Obasi. Rodd recruited a number of Minnesota investors to deposit money in Oval, telling them that the money would be invested in certificates of deposit or mutual funds.

Obasi deceived investors in numerous ways through direct conversations, promotional materials, and presentations made by Rodd. Obasi claimed for example that the investments were insured and guaranteed through the Securities and Investor Protection Corporation and the Federal Deposit Insurance Corporation (FDIC), and he told Rodd that the money was deposited in United States banks. The Minnesota investors received payments from Obasi which he described as interest on their investments but which were frequently late, and he also furnished them false account statements which claimed that their investments were guaranteed. One of these statements claimed an investment in a certificate of deposit insured by the FDIC. When the investors inquired about their funds, Obasi either failed to respond or claimed that he had invested them. He eventually told investors that Oval was bankrupt.

There was evidence at trial that none of the money was ever deposited in certificates of deposit or mutual funds as the investors had been promised. Rather, Obasi used the funds for making payments to previous investors, for stock and options

-2-

trading, for commission payments to Rodd, and for personal transactions. Some of the funds were sent to Excelsior Bank & Trust in Barbados, despite Obasi's promise to some investors that their funds would be deposited solely in United States banks.

Obasi was indicted on eight counts of mail fraud pursuant to 18 U.S.C. § 1341, eighteen counts of wire fraud pursuant to18 U.S.C. §§ 1343 and 2, and four counts of laundering of monetary instruments pursuant to18 U.S.C. § 1956(a)(1). Obasi pled not guilty, and his attorney submitted a request to the district court under the CJA, 18 U.S.C. § 3006A(e), for $7,500 in funds for an investigator to gather information for his defense. He hoped to collect evidence about Jeffrey Rodd, the Minnesota investors, the Barbados bank in which Obasi had deposited some of the investment funds, witnesses from other alleged fraudulent schemes whom the government might present at trial, and Oval which was based in California. After a magistrate judge[3] certified the request, it was forwarded to the chief judge of the circuit[4] who approved funds in the amount of $2,500.

Later at a pretrial conference, Obasi's counsel complained that he had not received the full funding he had requested and needed more funds to investigate the case and to hire an investigator to go to California to examine what he characterized as significant exculpatory evidence. The trial judge responded by explaining that,

> a more detailed explanation has to be given to the court other than saying there's some boxes out in California that if I was free to go get they would show that I was somehow innocent of this case. Something more than that has to be put on the record for the court to make any comments

---

[3]The Honorable Jonathan Lebedoff, then Chief Magistrate Judge for the District of Minnesota. Judge Lebedoff retired from his position on September 20, 2005.

[4]The Honorable James B. Loken, Chief Judge, United States Court of Appeals for the Eighth Circuit.

on that or to make any orders dealing with those documents being brought to court.

Obasi's counsel stated that he could not "provide a more detailed explanation at this point" but perhaps he could before trial. Obasi raised the funding issue again within several days, and the court instructed him to submit a written request. Although he agreed to do so, no written request was submitted.

The government notified Obasi six months before trial that it planned to introduce records from Excelsior Bank in Barbados where he had deposited some of the investment funds. The government also turned over copies of the records and a certification from their custodian in compliance with 18 U.S.C. § 3505(a), which permits the introduction of records of regularly conducted foreign activity. Obasi's counsel objected to the introduction of any Excelsior Bank records on the grounds that they were hearsay, that the certification was inadequate, and that the records were incomplete and possibly forged. He also mentioned an FBI report which he said had expressed concerns about the completeness and authenticity of the records. The government told the court that the only records it planned to introduce were Obasi's own requests for wire transfers from Excelsior Bank, but it made the complete set of records available to the defense. The district court found that the record certification was adequate, that the documents identified by the government were neither hearsay nor untrustworthy, and that the allegation of incompleteness did not make the records inadmissible.

The government gave notice one month before trial that it intended to present evidence about Hazel Clark, whom it identified as a "prior victim of Obasi's fraud". Clark was an elderly woman who had invested approximately $455,000 with Obasi through an intermediary. After her nephew Gary Seawright demanded return of her money, Obasi forwarded payments to him. The government's evidence showed that these payments were made from funds deposited by the Minnesota investors. Obasi

filed a motion in limine to exclude the evidence under Fed. R.Evid. 404(b); the motion was denied before trial.

At trial the government introduced evidence that Obasi had fraudulently misrepresented his own background, the status of his company, and the services he was providing. It elicited testimony concerning the dates the Minnesota investors turned over funds to Rodd, the amounts of money invested, and the varied uses Obasi made of the funds received from the investors. Obasi's failure to invest money as promised and his attempts to lull his victims into a false sense of security were evidenced by testimony from Jeffrey Rodd and the investors, as well as by introduction of records showing wire transfer requests made by Obasi to Excelsior Bank, including the dates and the amounts involved.

Gary Seawright testified about Hazel Clark's investment. He told the jury that Clark had invested approximately $455,000 with Obasi, that she was a frail woman in her eighties who had moved from a mobile home into assisted living, and that she was no longer able to manage her business affairs. When Seawright began discussing his review of Clark's records, Obasi objected on the grounds of relevance; the objection was overruled. When the prosecutor asked Seawright whether a check sent by Obasi to Clark reflected proceeds from a certificate of deposit or any type of mutual fund, Obasi objected that the question implied that it was he who had defrauded Clark. Obasi moved for a mistrial, but he did not request that the testimony be stricken. The district court overruled his objection and denied the motion for mistrial, and the parties agreed on a stipulation to be read to the jury. Pursuant to that agreement, the court informed the jury that the parties agreed that Obasi had not solicited "the referenced investment from Ms. Hazel Clark and that Ms. Clark received a complete settlement of her investment after a civil suit was brought on her behalf against a third party, Mr. [Renald] Leduc."

The jury returned guilty verdicts on eight counts of mail fraud, twenty five counts of wire fraud[5], and four counts of money laundering. It found that Obasi had caused a loss of $378,373.60 through his mail and wire fraud and that the value of funds involved in the money laundering charges was $26,150.00. Obasi moved for a new trial based on 1) prosecutorial misconduct by introduction of evidence suggesting that he had perpetrated fraud on an elderly unsophisticated victim and 2) the denial of full funding for his requested investigative services. The district court denied the motion, stating that "any mistaken impression that Seawright's testimony initially left on the jury was corrected by the stipulation that Obasi, himself, agreed upon" and that Obasi had never made a specific showing that he needed more funding. The court also commented that Obasi could have had his own records shipped from California, subpoenaed third party records, or made another ex parte request under the CJA.

Obasi appeals. He contends that the decision of the chief circuit judge to grant only $2,500 in funding for an investigator denied him the ability to mount an adequate defense, in violation of his due process, equal protection, and jury trial rights. He also claims that the district court improperly admitted evidence of foreign bank records and that the prosecutor committed misconduct while eliciting testimony about Hazel Clark's investment.

A defendant can submit an ex parte request for investigative services under § 3006A(e) of the CJA if he is unable to afford them. If the court finds that the services are "necessary and that the person is financially unable to obtain them," the court shall authorize the services. Id. Under the statute any request for over $1,600 must be certified by the district court or magistrate judge and approved by the chief judge of the circuit. District court action on the request is committed to its discretion, and

[5]One count of wire fraud had been dismissed before trial on the government's motion because the amount and date of the particular wire transfer had been incorrectly identified in the indictment.

"[d]enial or limitation of funds is not grounds for reversal absent a showing of prejudice." United States v. Bledsoe, 674 F.2d 647, 668 (8th Cir. 1982), cert. denied, 459 U.S. 1040 (1982). The defendant bears the burden of demonstrating that expert services are necessary. United States v. Valverde, 846 F.2d 513, 517 (8th Cir. 1988).

Although Obasi has the right to appeal an individual judge's ruling on his request for funds under the CJA, the situation is different in respect to the decision of the chief judge of the circuit because that judge is acting in an administrative capacity when reviewing the request rather than performing a judicial function. See United States v. Johnson, 391 F.3d 946, 948-49 (8th Cir. 2004), judgment vacated and remanded (2005); United States v. D'Andrea, 612 F.2d 1386, 1387-88 (7th Cir. 1980). Although a petition for rehearing is available to challenge a determination by an individual circuit judge and the district court decision is subject to appeal, a determination by the chief circuit judge can only be challenged by seeking reconsideration or mandamus in the Supreme Court. See D'Andrea, 612 F.2d at 1387-88. In our unvacated opinion in Johnson, we agreed with the reasoning in D'Andrea and held that:

> The chief judge's decision is neither "a final decision of the district court" under 28 U.S.C. § 1291, nor an appealable interlocutory order under 28 U.S.C. § 1292. It is instead an administrative decision that is beyond our jurisdiction.

Johnson, 391 F.3d at 949. We agree with the jurisdictional analysis in these cases.

Although jurisdiction is lacking over Obasi's attempted appeal of the CJA decision by the chief circuit judge, we do have jurisdiction over district court decisions on funding requests under 18 U.S.C. § 3006A(e) and we review them for abuse of discretion. See Johnson, 391 F.3d at 949 n. 4. In order to prevail on his challenge, Obasi must show that the action of the district court prejudiced him. Id.

(citing <u>United States v. Bledsoe</u>, 674 F.2d 647, 668 (8th Cir. 1982); <u>United States v. Bertling</u>, 370 F.3d 818, 820-21 (8th Cir. 2004)).

Obasi's written funding request only named individuals and institutions from which evidence might be obtained. It did not specify what evidence was needed or justify the amount of funds requested. Counsel said only that he needed travel funds for "additional investigation [in California] concerning Mr. Obasi's investment business, his contacts there, and [to] obtain witnesses located in California." Despite further opportunities before the district court during pretrial and posttrial proceedings, he failed to detail the materials he sought and presented only minimal declarations about their relevance although his offer of proof in his motion for a new trial was somewhat more specific than his earlier descriptions.

Obasi has similarly failed to present on appeal a specific account of his investigative needs or any prejudice suffered. Instead he has simply repeated the general subjects mentioned in his ex parte request and a need for "communications about and advertising from Excelsior Bank and its officers tending to demonstrate that the bank did indeed advertise and represent to Defendant and others that it was a legitimate, approved banking institution and that its deposits were insured and guaranteed." Obasi did not request subpoenas for California witnesses, issue discovery requests, or seek to depose bank officers or employees. The failure to renew the funding request, to clarify the importance of the records, or to seek the records by other means, <u>see</u> <u>United States v. Kasto</u>, 584 F.2d 268, 273-74 (8th Cir. 1978), <u>cert. denied</u>, 440 U.S. 930 (1979), undercuts Obasi's claim that more funds were necessary or that he was prejudiced by the district court's failure to approve further funding. Obasi has not shown any violation of his constitutional rights.

On appeal Obasi continues his challenge to the Excelsior Bank records as incomplete, as well as his attack on their authenticity and accuracy. He claims that some of the documents appear to have been altered by expunging deposit and credit

information and that the summaries were not prepared near the time of the recorded transactions as required under 18 U.S.C. § 3505. The government offered portions of the records into evidence to show the source of the funds which had been used to pay some investors and which had been represented as interest payments. The government responds that it made a sufficient showing that the wire transfer records were trustworthy and reliable. The records had been validly certified and had been prepared by Obasi himself, and they had been corroborated by Obasi's statements to Minnesota investors about interest payments and by witness testimony about these transfers. They were further supported by evidence showing receipt of the funds by banks in the United States. The government also points out that Obasi is arguing about the trustworthiness of business records which he himself introduced.

Under § 3505 foreign business records may be received unless they reflect untrustworthiness, and the wire transfer requests from Excelsior Bank were properly certified and were corroborated by domestic records and witness testimony. We conclude that these records were shown to be trustworthy and reliable and that the district court did not abuse its discretion in allowing their admission. To the extent that Obasi is challenging summaries of various Excelsior Bank transactions, rather than the wire transfer requests, we note that it was he who introduced them. He claims he introduced the summaries only to demonstrate that the government's exhibits were suspect, but he has not shown that the government exhibits were improper or that he was prejudiced by them.

Obasi alleges that the prosecutor engaged in misconduct depriving him of his constitutional right to a fair trial through a "blatant appeal to the passions and prejudice of the jury in its questioning of Government witness Gary Seawright." Prior to trial the government stated that its purpose in eliciting testimony from Seawright about Hazel Clark was to demonstrate that funds from the Minnesota investors had been used to repay other defrauded investors, rather than having been deposited in certificates of deposit and mutual funds as promised. The court limited the scope of

Seawright's testimony to exclude details relating to Clark's lawsuit against Obasi and others. The government contends that Seawright's testimony complied with the district court's order limiting its scope and that any possible prejudice was cured by the stipulation of both sides which was read to the jury. The government argues further that if there were any error in allowing the testimony and denying the motion for a new trial, then it was harmless given the amount of evidence against Obasi.

To show reversible misconduct by a prosecutor, a proponent must show that counsel engaged in improper conduct which "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Johnson, 968 F.2d 768, 770 (8th Cir. 1992). Obasi asserts that the prosecutor elicited precisely the evidence which was to have been excluded that was "at the heart of the California litigation" brought on behalf of Hazel Clark. He claims that the prosecutor's question to Seawright about the origin of the proceeds returned to Clark suggested that it had been Obasi who fraudulently solicited her money. To avoid any confusion, however, the parties agreed to a stipulation which was read to the jury and which made it clear that the individual who had solicited Clark's investment had been Renald LeDuc.

We conclude that not only did Seawright's testimony not breach the court's limitations on his testimony, but that Obasi was not unduly prejudiced by his testimony. The prejudicial impact of alleged prosecutorial misconduct must be assessed by looking at the "cumulative effect of the misconduct, determining if the court took any curative actions, and gauging the strength of the evidence against the defendant in the context of the entire trial." United States v. French, 88 F.3d 686, 689 (8th Cir. 1996). The focus of the trial was on the fraud perpetrated on the Minnesota investors. Seawright's testimony focused only on the amounts and timing of payments made to Clark. Any prejudice to Obasi by the prosecutor's question, about whether a particular check represented a return from a certificate of deposit or mutual fund, was cured by the fact that Seawright never answered the question and by the joint

stipulation read to the jury clarifying that another individual had fraudulently solicited Clark to invest with Obasi. We conclude that any prejudice would have had minimal impact at most on the questions at issue in the trial and that it would consequently be harmless. We conclude Obasi has not shown prosecutorial misconduct.

Because Obasi has not shown that his constitutional rights were violated by the denial of CJA funding for investigation, that the district court improperly admitted evidence, or that the prosecutor committed misconduct, we affirm the judgment of the district court.

BRIGHT, Circuit Judge, concurring.

The D'Andrea and Johnson cases stand for the proposition that the Chief Judge's decision on funding under Section 3006A of the Criminal Justice Act may not be attacked directly as an interlocutory order. However, that issue may be subject to review in an appeal from a judgment of conviction where the appellant contends the conviction was imposed in violation of his due process right to present an adequate defense. See Ake v. Oklahoma, 470 U.S. 68, 76-77 (1985) ("[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense."); United States v. Abreu, 202 F.3d 386, 388 (1st Cir. 2000) ("This court has appellate jurisdiction over § 3006A determinations that impact a defendant's trial or sentence."); United States v. Bloomer, 150 F.3d 146, 149 (2d Cir. 1998) (same).

Here, however, Obasi has not shown with the required specificity his need for the full amount of funds that he requested, nor that his defense was prejudiced by lack of funds, nor that he was deprived of due process in the presentation of his defense.

Thus, I concur separately.

_____