# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 5, 2023 Session

## JESSIE DOTSON v. STATE OF TENNESSEE

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 08-07688   James C. Beasley, Jr., Special Judge**

_____

### No. W2019-01059-SC-R11-PD
_____

This appeal involves a capital post-conviction petitioner's expert funding requests under Tennessee Supreme Court Rule 13. A jury convicted the Petitioner, Jessie Dotson, of six counts of premeditated first-degree murder and sentenced him to death. This Court affirmed the jury's verdict. The Petitioner filed for post-conviction relief, alleging several grounds of ineffective assistance of counsel. He requested funds under Tennessee Supreme Court Rule 13 to hire expert witnesses to assist in establishing his claims of ineffective assistance of counsel. The post-conviction court authorized the funds, but the Director of the Administrative Office of the Courts (AOC) and the Chief Justice denied approval for some of the Petitioner's requested experts. After an evidentiary hearing, the post-conviction court denied relief. The Court of Criminal Appeals affirmed the ruling without deciding the Petitioner's Rule 13 constitutional challenges. We granted review to consider the Petitioner's constitutional issues regarding Rule 13. We hold the provisions of Rule 13 are constitutional as applied; the Petitioner was not unconstitutionally denied appellate review of the denial of his request for expert funds; and the Petitioner was not deprived of a full and fair post-conviction hearing due to the denial of expert funds.

**Tenn. R. App. P. 11 Appeal by Permission; Judgments of the Trial Court and Court of Criminal Appeals Affirmed on Other Grounds**

SHARON G. LEE, J., delivered the opinion of the Court, in which ROGER A. PAGE, C.J., and HOLLY KIRBY and SARAH K. CAMPBELL, JJ., joined. JEFFREY S. BIVINS, J., not participating.[1]

---

[1] On the Petitioner's motion, Justice Bivins, who served as the Chief Justice during the relevant time period, recused from participation in this appeal before any consideration of the Rule 11 application.

Justyna Scalpone, Post-Conviction Defender; and Kelly A. Gleason and Andrew L. Harris, Assistant Post-Conviction Defenders, Nashville, Tennessee, for the appellant, Jessie Dotson.

Jonathan Skrmetti, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Courtney N. Orr, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stephen Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

David R. Esquivel and Michael C. Tackeff, Nashville, Tennessee, for Amici Curiae, Former Access to Justice Commission Chairs, Tennessee Innocence Project, Choosing Justice Initiative, and Tennessee Association of Criminal Defense Lawyers.

## OPINION

This appeal focuses on Rule 13 and the administration of funds appropriated by the General Assembly for the provision of expert, investigative, or other similar services for indigent post-conviction petitioners in capital cases. Rule 13 establishes the procedures indigent defendants must use to request funds for expert services in the trial court and for the AOC Director and the Chief Justice's administrative review of the trial court's authorization of funds. Tenn. Code Ann. § 40-14-207(b) (2012); Tenn. Sup. Ct. R. 13.

The Petitioner requested funds under Rule 13 to hire expert witnesses to assist in his post-conviction proceedings. In the four instances at issue here, the post-conviction court authorized the funds, but the AOC Director and the Chief Justice either reduced the requested amount or denied approval of the funds. The Petitioner proceeded under protest to the post-conviction evidentiary hearing without the assistance of these witnesses. The post-conviction court denied relief, and the Court of Criminal Appeals affirmed.

We granted the Petitioner's application for permission to appeal under Rule 11 of the Tennessee Rules of Appellate Procedure to consider these issues: whether the provisions of Rule 13 for prior approval review are unconstitutional, as applied; whether the Petitioner has been unconstitutionally denied appellate review of the denial of expert funds; and whether the Petitioner has been deprived of his statutory right to a full and fair post-conviction hearing due to the denial of expert funds.[2]

---

[2] Citing *State v. Linville*, 647 S.W.3d 344 (Tenn. 2022), the State asserts that the Petitioner's arguments challenging Rule 13 and the authority of the AOC Director and the Chief Justice to deny prior approval of expert funds are waived because these arguments were not stated as questions for review in the Petitioner's Rule 11 application. However, in *Linville*, the defendant raised an issue in his brief that had not been raised in his Rule 11 application. *Id.* at 353 (noting that "the substance of [Linville's] application" contained "no mention of any challenge to mandatory minimum sentencing" and further observing that

These issues present questions of law, which we review de novo with no presumption of correctness. *State v. McCoy*, 459 S.W.3d 1, 8 (Tenn. 2014) (citing *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009)); *Pratcher v. Methodist Healthcare Memphis Hosps.*, 407 S.W.3d 727, 734 (Tenn. 2013). We interpret Supreme Court Rules using the same rules of construction as when we interpret statutes. *Thomas v. Oldfield*, 279 S.W.3d 259, 261 (Tenn. 2009) ("In construing the rules of this Court, . . . our goal is to ascertain and give effect to this Court's intent in adopting its rules."). As the promulgator of Rule 13, this Court "is the rule's primary arbiter." *In re Gant*, 937 S.W.2d 842, 846 (Tenn. 1996).

*Tennessee Supreme Court Rule 13*

The Tennessee General Assembly annually appropriates a finite and limited amount of funds for indigent litigants in capital cases. Tennessee Code Annotated section 40-14-207(b) provides for investigative or expert services for indigent defendants:

> (b) In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, the court in an *ex parte* hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If that determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the reimbursement of reasonable and necessary expenses by the administrative director of the courts as authorized by this part and rules promulgated thereunder by the supreme court.

Tenn. Code Ann. § 40-14-207(b). This Court adopted Rule 13 as the procedural framework for administration of these funds and later amended Rule 13 to include provisions for capital post-conviction cases.[3] Rule 13, section 5 provides:

> **Section 5. Experts, investigators, and other support services.**
>
> (a)(1) In the trial and direct appeal of all criminal cases in which the defendant is entitled to appointed counsel and in the trial *and appeals of*

---

Linville, "in his brief before the Court of Criminal Appeals, specifically stated that he was 'not raising an issue as to sentencing in this appeal' other than the clerical error"). Here, the Petitioner preserved his arguments relating to these issues below, raised them in his Rule 11 application, and briefed them. Thus, *Linville* is distinguishable and the Petitioner's issues were not waived.

[3] *Owens v. State*, 908 S.W.2d 923, 924 (Tenn. 1995) (concluding section 40-14-207(b) applies to capital post-conviction cases).

*post-conviction proceedings in capital cases* involving indigent petitioners, the court, in an *ex parte* hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If such determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court. The authorization shall be evidenced by a signed order of the court. The order shall provide for the payment or reimbursement of reasonable and necessary expenses by the director. *See* Tenn. Code Ann. § 40-14-207(b); *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995); *Owens v. State*, 908 S.W.2d 923 (Tenn. 1995).

. . . .

(b)(1) Every effort shall be made to obtain the services of a person or entity whose primary office of business is within 150 miles of the court where the case is pending. If the person or entity proposed to provide the service is not located within the 150-mile radius, the motion shall explain the efforts made to obtain the services of a provider within the 150-mile radius.

(2) Any motion seeking funding for expert or similar services shall itemize:

(A)  the nature of the services requested;
(B)  the name, address, qualifications, and licensure status, as evidenced by a curriculum vitae or resume, of the person or entity proposed to provide the services;
(C)  the means, date, time, and location at which the services are to be provided; and
(D)  a statement of the itemized costs of the services, including the hourly rate, and the amount of any expected additional or incidental costs.

(3) Any motion seeking funding for investigative or other similar services shall itemize:

(A)  the type of investigation to be conducted;
(B)  the specific facts that suggest the investigation likely will result in admissible evidence;
(C)  an itemized list of anticipated expenses for the investigation;
(D)  the name and address of the person or entity proposed to provide the services; and
(E)  a statement indicating whether the person satisfies the licensure requirement of this rule.

(4) If a motion satisfies these threshold requirements, the trial court must conduct an *ex parte* hearing on the motion and determine if the requested services are necessary to ensure the protection of the defendant's constitutional rights.

(c)(1) Funding shall be *authorized* only if, after conducting a hearing on the motion, the court determines that there is a particularized need for the requested services and that the hourly rate charged for the services is reasonable in that it is comparable to rates charged for similar services.

. . . .

(3) *Particularized need in the context of capital post-conviction proceedings is established when a petitioner shows, by reference to the particular facts and circumstances of the petitioner's case, that the services are necessary to establish a ground for post-conviction relief and that the petitioner will be unable to establish that ground for post-conviction relief by other available evidence. See Owens*, 908 S.W.2d at 928.

(4) Particularized need cannot be established and funding requests should be denied where the motion contains only:

(A) undeveloped or conclusory assertions that such services would be beneficial;
(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
(C) information indicating that the requested services relate to factual issues or matters within the province and understanding of the jury; or
(D) information indicating that the requested services fall within the capability and expertise of appointed counsel. *See, e.g.*, *Barnett*, 909 S.W.2d at 430; *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985); *State v. Abraham*, 451 S.E.2d 131, 149 (N.C. 1994).

(d)(1) The director and/or the chief justice shall maintain uniformity as to the rates paid individuals or entities for services provided to indigent parties. Appointed counsel shall make every effort to obtain individuals or entities who are willing to provide services at an hourly rate less than the maximum. Although not an exclusive listing, compensation for individuals or entities providing the following services shall not exceed the following maximum hourly rates:

(A) Accident Reconstruction $115.00
(B) Medical Services/Doctors $250.00
(C) Psychiatrists $250.00
(D) Psychologists $150.00
(E) Investigators (Guilt/Sentencing) $50.00

. . . .

(2) For persons or entities compensated at a rate of one hundred dollars ($100) per hour or more, time spent traveling shall be compensated at no greater than fifty percent (50%) of the approved hourly rate.

. . . .

(4) *In a post-conviction capital case, a trial court shall not authorize more than a total of $20,000 for all investigative services, unless in its sound discretion the trial court determines that extraordinary circumstances exist that have been proven by clear and convincing evidence.*

(5) *In a post-conviction capital case, a trial court shall not authorize more than a total of $25,000 for the services of all experts unless in its sound discretion the trial court determines that extraordinary circumstances exist that have been proven by clear and convincing evidence.*

(6) Expenses shall not be authorized or approved for expert tests or expert services if the results or testimony generated from such tests or services will not be admissible as evidence.

(e)(1) If the requirements of sections 5(c) and (d) are satisfied and the motion is granted, the *authorization* shall be evidenced by a signed order of the court. Unless otherwise indicated in the order, the amount authorized includes both fees and necessary expenses under section 4(a).

(2) The order shall include a finding of particularized need and the specific facts that demonstrate particularized need as well as the information required by section 5(b)(1) or (b)(2).

(3) The court may satisfy the requirements of subsection (2) above by incorporating and attaching that portion of the defense motion that includes the specific facts supporting the finding of particularized need.

*(4) Once the services are authorized by the court in which the case is pending, the order and any attachments must be submitted in writing to the director for prior approval. Claims for these services may not be submitted electronically.*

*(5) If the director denies prior approval of the request, the claim shall also be transmitted to the chief justice for disposition and prior approval. The determination of the chief justice shall be final.*

Tenn. Sup. Ct. R. 13, § 5 (emphases added).[4]

Under Rule 13, before a post-conviction court can authorize funds for expert services, the court has to determine there is a particularized need for the requested expert services and that the hourly rate for the services is reasonable. *Id.* §§ 5(c)(1), (3). The petitioner has to show the expert services are necessary to establish a ground for relief and that the ground cannot be established by other available evidence. *Id.* § 5(c)(3). The court cannot authorize more than $25,000 for all expert services unless there is proof by clear and convincing evidence that extraordinary circumstances exist. *Id.* § 5(d)(5). The prior authorization order has to be submitted to the AOC for approval. *Id.* § 5(e)(4). If the AOC Director denies the request, the claim is sent to the Chief Justice for final disposition. *Id.* § 5(e)(5).

This appeal involves four of the Petitioner's requests for Rule 13 funds, one of which was approved but at a lesser hourly rate and the remaining three that the Chief Justice did not approve.[5]

### Dr. Bhushan S. Agharkar

In March 2017, the Petitioner filed an *ex parte* motion seeking $17,500 based on an hourly rate of $350 for the expert services of Dr. Bhushan S. Agharkar, a psychiatrist. According to the motion, Dr. Agharkar's services were a necessary component of the Petitioner's claim that trial counsel failed to adequately investigate and present available mental health defenses and mitigating evidence. After an *ex parte* hearing, the post-conviction court found the funds were necessary and granted prior authorization for the requested amount. The AOC Director approved the funding request at a reduced hourly rate of $250 consistent with the rate schedule in Rule 13. The Chief Justice concurred in the AOC Director's decision.

---

[4] Rule 13, section 5 was amended to apply to juvenile transfer proceedings after the Petitioner filed his expert funding requests.

[5] The Petitioner sought and obtained funds for other experts that are not at issue in this appeal.

After receiving notice of the rate reduction, the Petitioner moved the post-conviction court to vacate his death sentences. He claimed Dr. Agharkar did not accept the reduced rate, and the denial of necessary expert services violated the Petitioner's due process rights for expert assistance, his right to a full and fair hearing, and his right not to be subjected to cruel and unusual punishment. The post-conviction court denied the motion, noting that the Petitioner had not been denied all expert assistance.[6]

### Dr. James R. Merikangas

In June 2018, the Petitioner filed an *ex parte* motion seeking $10,000 at an hourly rate of $250 plus reasonable expenses to retain Dr. James R. Merikangas, a neurologist. The motion asserted the requested services were a crucial component of the investigation and proof of the Petitioner's claim that trial counsel failed to adequately investigate and present available mental health defenses and mitigation evidence. The motion noted that if all of the requested services were completed, the request for funds could exceed Rule 13's $25,000 limit for all expert services. The post-conviction court granted prior authorization, finding that extraordinary circumstances existed for the funding to exceed the $25,000 cap.

### Dr. Richard Leo

In August 2018, the Petitioner filed an *ex parte* motion seeking $9,000 at an hourly rate of $150 plus travel expenses in expert funding for Dr. Richard A. Leo, a false confession expert. The Petitioner explained that trial counsel had previously retained Dr. Leo to assist with their investigation of the case but had not used his services. The Petitioner stated that the services of Dr. Leo were a crucial component of the investigation and proof of the Petitioner's claim that his trial counsel failed to adequately investigate the State's case, failed to consult with the appropriate forensic experts, and failed to prepare a challenge to the State's physical evidence. The post-conviction court found that the funds were necessary, that extraordinary circumstances existed to exceed the cap, and granted prior authorization up to a total of $9,000 at an hourly rate of $150 plus expenses.

### Dr. James S. Walker

In September 2018, the Petitioner filed an *ex parte* motion seeking $1,425 at an hourly rate of $150 to hire Dr. James S. Walker, a neuropsychologist. The motion acknowledged that trial counsel had previously retained Dr. Walker but chose not to call

---

[6] The post-conviction court denied the Petitioner's request for an appeal under Rule 9 of the Tennessee Rules of Appellate Procedure. The Court of Criminal Appeals and this Court denied the Petitioner's applications for an extraordinary appeal under Rule 10. *See Dotson v. State*, No. W2017-02550-CCA-R10-PD (Tenn. Crim. App. Mar. 29, 2018) (order); *Dotson v. State*, No. W2017-02550-SC-R10-PD (Tenn. May 10, 2018) (order).

him as a witness at trial. The Petitioner characterized Dr. Walker as a fact witness in one sense but noted that his testimony would primarily involve matters of specialized knowledge and opinion about his neuropsychological findings and conclusions. The motion indicated that Dr. Walker's services were necessary to develop and prove the Petitioner's claim that counsel failed to present available mitigating evidence regarding the Petitioner's diagnosed mental diseases and defects. The post-conviction court found the funds were necessary, that extraordinary circumstances existed to exceed the $25,000 cap, and granted prior authorization for $1,425 to retain Dr. Walker.

The Petitioner orally informed the post-conviction court that the AOC Director and the Chief Justice had denied approval for the funding requests for Dr. Merikangas, Dr. Leo, and Dr. Walker.

*Constitutional Challenges to Rule 13*

The Petitioner asserts that the AOC Director and the Chief Justice interpreted the prior approval review provisions in Rule 13, sections 5(e)(4) and 5(e)(5) as granting them the authority to review the post-conviction court's substantive findings and to "vacate" the post-conviction court's prior authorization orders. He maintains that this substantive review by the AOC Director and the Chief Justice constituted an improper exercise of judicial power in violation of Article II, sections 1 and 2 and Article VI, sections 1, 2, and 3 of the Tennessee Constitution.

Article II, sections 1 and 2 are the separation of powers provisions of the Tennessee Constitution, providing that the powers of the government are divided into Legislative, Executive, and Judicial departments and that no person in one of these departments shall exercise any of the powers belonging to the others. Tenn. Const. art. II, §§ 1–2. Article VI relates to the Judicial Department, providing in section 1 that the judicial power of this State is "vested in one Supreme Court and in such Circuit, Chancery and other Inferior Courts as the Legislature shall from time to time, ordain and establish." Tenn. Const. art. VI, § 1. Section 2 provides that the Supreme Court shall consist of five judges and that the "concurrence of three of the judges shall in every case be necessary to a decision." Tenn. Const. art. VI, § 2. Finally, section 3 provides that the judges of this Court or any intermediate appellate court shall be appointed by the Governor and confirmed by the Legislature. Tenn. Const. art. VI, § 3.

The Petitioner submits that under Article VI, section 1, the General Assembly granted the post-conviction court jurisdiction over post-conviction proceedings and vested that court with the state's judicial power. *See* Tenn. Code Ann. §§ 16-10-101, -102 (2009); 40-30-104(a) (2012). The Petitioner asserts that the post-conviction court properly exercised its judicial power when it granted prior authorization of expert funding. According to the Petitioner, only an entity vested with the state's judicial power can

substantively review and set aside the post-conviction court's prior authorization orders. Citing Article VI, sections 1, 2, and 3 of the Tennessee Constitution, the Petitioner contends that neither the AOC Director nor the Chief Justice, acting alone, is vested with the state's judicial power and thus had no authority to substantively review and deny prior approval of the post-conviction court's prior authorization orders.

At the heart of the Petitioner's argument is the premise that the AOC Director and the Chief Justice conducted a substantive review. As we will explain, this premise is faulty. No language in Rule 13, including sections 5(e)(4) and 5(e)(5), authorizes substantive review by the AOC Director or the Chief Justice in the prior approval process. As promulgator of Rule 13, it was not the Court's intent to authorize substantive review. *Gant*, 937 S.W.2d at 846.

Under Rule 13, denial of prior approval by the AOC Director and the Chief Justice can be based on a prior authorization order that is noncompliant with Rule 13 or an administrative funding decision.[7] There is no suggestion here that the prior authorization orders did not comply with Rule 13. With no substantive review and no Rule 13 compliance issues, we conclude the AOC Director and the Chief Justice denied prior approval based on an administrative funding decision. This Court, through the AOC Director, has to efficiently and fairly manage the limited pool of funds for indigent non-capital and capital defendants facing trial and for indigent petitioners in capital post-conviction cases. Rule 13, section 6(b)(2) requires the AOC Director to give due consideration to state revenues when deciding compensation and reimbursement claims. The post-conviction court need not consider budgetary concerns. Throughout any fiscal year, the AOC Director receives prior authorization orders for funds from trial courts across the state. If funding for expert assistance was unlimited, then all Rule 13 requests could conceivably be granted. But that is not realistic. Funds are limited, and there has to be a mechanism for regulating the flow of funds. That is the role of the AOC Director and the Chief Justice in Rule 13. A prior authorization order from a post-conviction court is no guarantee or promise of payment. Otherwise, the AOC Director would simply verify compliance with Rule 13 and pay out the authorized funds chronologically until the funds are depleted. Implicit in the General Assembly's statutory authorization of this Court's administration of the finite pool of funds is an expectation that the Court has to make administrative funding decisions based on the amount of requested funds and the available funding resources. With limited funds, not all prior authorization orders can be approved. Because substantive review is not authorized by Rule 13 and because this record contains no indication substantive review occurred, the Petitioner has failed to establish that the AOC Director and the Chief Justice improperly exercised judicial authority in violation of the Tennessee Constitution.

---

[7] *See, e.g.*, Tenn. Sup. Ct. R. 13, § 6(b)(2) (indicating the director gives "due consideration to state revenues" after auditing claims for compliance with this rule).

Next, the Petitioner argues that the prior approval process in sections 5(e)(4) and 5(e)(5) violates his procedural due process rights under Article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. He contends the process failed to provide him with notice of the evidence considered by the AOC Director and/or the Chief Justice in their decision to deny the funding requests, and he was denied the ability to contest their decision.

We begin with the applicable constitutional provisions. Article I, section 8 of the Tennessee Constitution states in part that "no man shall be . . . deprived of his life, liberty or property, but by the judgment of his peers, or the law of the land." Tenn. Const. art. I, § 8. The Fourteenth Amendment, section 1, provides that the states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he procedural due process protections in these two provisions are essentially the same." *Heyne v. Metro. Nashville Bd. of Pub. Educ.*, 380 S.W.3d 715, 731 (Tenn. 2012).

When considering a procedural due process claim, a reviewing court must first determine whether a petitioner has an interest entitled to due process protection. *See id.* (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570–71 (1972); *Rowe v. Bd. of Educ. of Chattanooga*, 938 S.W.2d 351, 354 (Tenn. 1996)). If the petitioner has a protected interest, "then the court must determine 'what process is due.'" *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)) (citing *Martin v. Sizemore*, 78 S.W.3d 249, 263 (Tenn. Ct. App. 2001)). "Once the court determines [the] minimum procedural due process protections to which the person is entitled, the court must finally determine whether the challenged procedures satisfy these minimum requirements." *Id.*

In considering whether a petitioner has an interest that is entitled to due process protection, a court may look beyond the federal and state constitutions because state law may create and define the dimensions of constitutionally protected interests. *Id.* (citing *Roth*, 408 U.S. at 577). The interest asserted by the Petitioner stems from Tennessee Code Annotated section 40-14-207(b), a statute that provides indigent capital litigants access to funds for investigative, expert, or other similar services. *See Owens v. State*, 908 S.W.2d 923, 929 (Tenn. 1995). The Petitioner sought access to these funds for expert assistance during a state post-conviction proceeding, which is a statutory procedural vehicle to collaterally challenge a conviction or sentence as "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012); *see also* Tenn. Code Ann. § 40-30-101 to -123 (known as the Post-Conviction Procedure Act). Post-conviction proceedings are not constitutionally required. *See Davis v. State*, 912 S.W.2d 689, 695 (Tenn. 1995). Thus, our narrow focus is whether the state statute that provides access to expert funds during post-conviction proceedings creates a constitutionally protected interest in the funds.

Citing *Goldberg v. Kelly*, 397 U.S. 354 (1970), the Petitioner compares this indigent fund pool to federal public assistance payments under the Aid to Families with Dependent Children program. The Petitioner asserts he has a legal entitlement to the indigent funds when he makes the specified showing. However, unlike the financial assistance benefits in *Goldberg*, our General Assembly makes a finite appropriation of these indigent funds, requiring administration funding decisions to be made. Neither Tennessee Code Annotated section 40-14-207(b) nor Rule 13 creates any right to the funds, and Rule 13 merely establishes a procedural mechanism for implementing the indigent funding statute. *Owens*, 908 S.W.2d at 928 n.10 (citing *Allen v. McWilliams*, 715 S.W.2d 28, 29 (Tenn. 1986)). Indigent litigants may apply for funds to assist in post-conviction proceedings. Although a post-conviction court may grant prior authorization of funds upon the proper showing, the post-conviction court has no authority to direct payment of the funds. Instead, prior approval lies with the AOC Director, and ultimately with the Chief Justice, and necessarily hinges on an administrative funding decision. *See, e.g.*, *Rosenfield v. Wilkins*, 468 F. Supp. 2d 806, 810–811 (W.D. Va. 2006) (explaining that "a property right cannot emanate from a mere subjective expectancy" and concluding that appointed attorneys have no entitlement under the Criminal Justice Act (CJA) to fee payments they request and no constitutionally protected property interest in any particular level of payment (quoting *Guerra v. Scruggs*, 942 F.2d 270, 278 (4th Cir. 1991))).

Thus, neither *Goldberg* nor other cited authority supports the Petitioner's contention he has a constitutionally protected right in the finite pool of indigent funds. Because the Petitioner cannot establish a constitutionally protected right, he cannot establish that the prior approval provisions of Rule 13 deny him procedural due process.

*Appellate Remedy*

The Petitioner's next series of arguments stems largely from the Court of Criminal Appeals' opinion in its direct review of the post-conviction court's denial of relief. *See Dotson v. State*, No. W2019-01059-CCA-R3-PD, 2022 WL 860414 (Tenn. Crim. App. Mar. 23, 2022). The Petitioner challenged the denial of funding in the Court of Criminal Appeals, raising numerous constitutional challenges to sections 5(e)(4)–(5) and the actions of the AOC Director and the Chief Justice in denying prior approval under those provisions. The Court of Criminal Appeals explained that when a trial court denies *ex parte* requests for expert funds, a petitioner may seek review through an interlocutory appeal under Tennessee Rule of Appellate Procedure 9, an extraordinary appeal under Rule 10, or when challenged as part of an appeal from a judgment of conviction under Rule 3(b). *Id.* at *64 (citing *State v. Todd*, No. M2006-01940-CCA-R3-CD, 2007 WL 1582661, at *2 (Tenn. Crim. App. May 31, 2007)). The intermediate appellate court noted, however, that the Petitioner was not seeking review of any direct actions of the post-conviction court related to funding as part of his challenge to the post-conviction court's judgment. *Id.* at *65. Instead, the Petitioner directly challenged the determinations of the AOC Director and the

Chief Justice in denying prior approval of the expert funding requests under Rule 13. *Id.* Citing Tennessee Rule of Criminal Procedure 37(b), the Court of Criminal Appeals observed that a defendant may appeal any order or judgment in a criminal proceeding when the law provides for such an appeal; however, Rule 13 does not provide for an appeal of the Chief Justice's denial of prior approval of expert funds. *Id.* Additionally, the Court of Criminal Appeals concluded it was without authority to decide constitutional challenges to Rule 13, sections 5(e)(4)–(5) because this Court has previously held that inferior courts do not have the authority to invalidate a supreme court rule. *Id.* As a result, the Court of Criminal Appeals determined the Petitioner was not entitled to relief on this issue. *Id.*

The Petitioner now asserts that the Court of Criminal Appeals unconstitutionally denied him a forum to review the AOC Director's and the Chief Justice's denial of prior approval of expert services authorized by the post-conviction court. The Petitioner argues the Court of Criminal Appeals erred when it concluded he was not entitled to review of the prior approval decisions under Tennessee Rule of Appellate Procedure 3(b).

The Post-Conviction Procedure Act authorizes an appeal from a post-conviction court's order denying post-conviction relief "in the manner prescribed by the Tennessee Rules of Appellate Procedure." Tenn. Code Ann. § 40-30-116. Rule 3(b) of the Tennessee Rules of Appellate Procedure identifies the right to appeal the post-conviction court's judgment as an appeal as of right. Tenn. R. App. P. 3(b). But here, the Petitioner was seeking appellate review of the Chief Justice's denial of prior approval, not denial of prior authorization by the post-conviction court. When a post-conviction court denies or limits prior authorization of expert funds, a petitioner may seek interlocutory review of the post-conviction court's actions or omissions under Rules 9 or 10 of the Tennessee Rules of Appellate Procedure, or he may seek review of the court's denial of prior authorization, including the propriety of the reasons for the denial, as part of his appeal of a final judgment denying post-conviction relief under Rule 3(b).[8] Here, the post-conviction court granted prior authorization of the requested expert funds, and the AOC Director and the Chief Justice denied prior approval. Thus, unlike the post-conviction court's reasons for denying prior authorization, which are subject to review as part of the post-conviction court's final judgment, the Chief Justice's Rule 13 administrative reasons for denying prior approval are not subject to further review. *See* Tenn. Sup. Ct. R. 13, § 5(e)(5) ("The determination of the chief justice shall be final."). The Court of Criminal Appeals properly concluded that the Chief Justice's Rule 13 funding decisions were not reviewable as part of the post-conviction court's final judgment under Rule 3. We also agree with the Court of Criminal Appeals that it lacked authority to consider constitutional challenges to the Rule 13 prior approval provisions when its decision could invalidate portions of Rule 13. *Gant*, 937 S.W.2d at 846 (indicating that lower courts have no authority to invalidate a supreme

---

[8] The post-conviction court's denial or limitation of prior authorization is reviewed under the abuse of discretion standard. *See Reid ex rel. Martiniano v. State*, 396 S.W.3d 478, 517 (Tenn. 2013).

court rule and that "the [s]upreme [c]ourt, as the promulgator of the rule, is the rule's primary arbiter").

The Petitioner argues that he was denied a direct appeal of the funding decision in violation of the Open Courts Clause of the Tennessee Constitution and his state and federal rights to equal protection. The Open Courts Clause provides in part that "all courts shall be open; and every man, for injury done him . . . shall have remedy by due course of law . . . ." Tenn. Const. art. I, § 17. Here, our courts have been open to the Petitioner throughout his trial, his direct appeal of his convictions, and now in his post-conviction collateral challenges to his convictions. The Petitioner cites no authority, and we find none, indicating the Open Courts Clause requires review of an administrative funding decision within statutory post-conviction proceedings. The Petitioner has "open courts" from the post-conviction court through this Court to adjudicate his post-conviction challenges to his convictions and/or sentences, including consideration of whether the denial of funds deprived him of a full and fair post-conviction hearing. Thus, we find no basis for relief based on the Open Courts Clause.

Next, both the state and federal constitutions guarantee equal protection of the law, meaning "all persons similarly circumstanced shall be treated alike." *State v. Robinson*, 29 S.W.3d 476, 480 (Tenn. 2000) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993)); U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8, art. XI, § 8. "Conversely, things which are different in fact or opinion are not required by either constitution to be treated the same." *Tenn. Small Sch. Sys.*, 851 S.W.2d at 153 (quoting *Doe v. Norris*, 751 S.W.2d 834, 841 (Tenn. 1988)). The Petitioner argues that the Court of Criminal Appeals' refusal to consider the denial of prior approval by the Chief Justice denied him equal protection of the law by creating two separate classes of capital petitioners: (1) a class of petitioners who were denied prior authorization of expert services by the post-conviction court but whose denials of funds were reviewed in a Rule 3 appeal, and (2) a class of petitioners who were denied prior approval by the AOC Director and the Chief Justice but whose denial of funds will not be reviewed in a Rule 3 appeal. We disagree. The two classes are seeking different types of review. The first class seeks review of an authorization for funds by a post-conviction court based on its substantive review of the merits of the petitioner's need for experts. The second class seeks review of an administrative funding decision of the AOC and the Chief Justice, based on the need to marshal limited funds available for more requests than can be granted. Petitioners in each respective class are treated the same. While the end result of both types of review may be the same—denial of funds—the nature of the two types of review are fundamentally different.[9] For these reasons, we conclude the Petitioner's equal protection argument is without merit.

---

[9] As discussed below, ultimately, a petitioner in either class may argue that the denial of funds deprived the petitioner of a full and fair post-conviction hearing.

- 14 -

Having concluded the Court of Criminal Appeals correctly declined to review this issue under Rule 3, we focus on the larger question of whether due process requires appellate review of the administrative funding decisions of the Chief Justice. Our review is unique in that the administration of the appropriated indigent defense funds in Tennessee rests solely with this Court and its administrative office. We have a narrow body of caselaw that addresses the denial of prior authorization of funds by trial courts. However, we have no cases in which an indigent capital litigant has sought review of the denial of prior approval after a post-conviction court grants prior authorization. Looking beyond Tennessee law for guidance is not particularly useful because each jurisdiction has a different administrative mechanism for dispersing indigent funds. However, the CJA, which makes funds available to indigent litigants in federal court, is instructive. *See* 18 U.S.C.A. § 3006A.

Through the CJA, Congress appropriates funds for indigent representation and for investigative, expert, or other services necessary for adequate representation. *Id.* In part, the statute provides:

> **(e) Services other than counsel.** –
>
> > **(1) Upon request.** – Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.
>
> > . . . .
>
> > **(3) Maximum amounts.** – Compensation to be paid to a person for services rendered by him to a person under this subsection, or to be paid to an organization for services rendered by an employee thereof, shall not exceed $2,400, exclusive of reimbursement for expenses reasonably incurred, unless payment in excess of that limit is certified by the court, or by the United States magistrate judge if the services were rendered in connection with a case disposed of entirely before him, as necessary to provide fair compensation for services of an unusual character or duration, and the amount of the excess

- 15 -

payment is approved by the chief judge of the circuit. The chief judge of the circuit may delegate such approval authority to an active or senior circuit judge.

. . . .

**(f) Receipt of other payments.** – Whenever the United States magistrate judge or the court finds that *funds are available* for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid . . . to any person or organization authorized pursuant to subsection (e) to render investigative, expert, or other services . . . .

*Id.* § 3006A(e), (f) (emphasis added).

Rule 13 does not mirror the CJA, but we find both useful analogies and important distinctions that inform our inquiry. Similar to Rule 13, the CJA allows indigent federal litigants to request funds for expert services via an ex parte application and ex parte proceeding. *Id.* § 3006A(e)(1). Upon finding that the expert services are necessary, the district court or magistrate judge authorizes the expert services up to the presumptive funding caps set out in the CJA. *Id.* § 3006A(e)(1), (3). A notable difference between the CJA and Rule 13 is that the CJA authorizes the district court, or magistrate, to authorize or direct that the funds be paid to the expert after "find[ing] that funds are available for payment." *Id.* § 3006A(f). In contrast, under Rule 13, the AOC Director and the Chief Justice have the authority to assess the availability of funds and approve payment to the experts. Tenn. Sup. Ct. R. 13, § 5(e). The CJA, like Rule 13, also allows a litigant to seek funds in excess of the cap if the district court or magistrate judge certifies that the additional funds are necessary to provide fair compensation for services of an unusual character or duration and the amount of the excess payment is certified by the chief judge of the circuit. 18 U.S.C.A. § 3006A(e)(3).

Federal courts interpreting the CJA have concluded that an indigent litigant may appeal the district court judge's denial of funds. *See United States v. Obasi*, 435 F.3d 847, 852 (8th Cir. 2006). Although the CJA is silent on the availability of review of the decisions of the chief judge to reduce or deny funds in excess of the cap, even when certified by the district court or magistrate, courts have determined that the chief judge acts in an administrative capacity when reviewing the request rather than performing a judicial function. *Id.* (challenging the chief judge's approval of a sum $5,000 less than the amount of funds certified by the district court for an investigator);[10] *see also United States v. Snarr*, 704 F.3d 368, 403–04 (5th Cir. 2013) (challenging the chief judge's reduction and denial

---

[10] *Cf. Ayestas v. Davis*, ___ U.S. ___, 138 S.Ct. 1080, 1090 (2018) (describing the *district court's* denial of a petitioner's request for funding as a judicial decision).

of funds certified by the district judge); *In re Marcum, L.L.P.*, 670 F.3d 636, 637–38 (5th Cir. 2012) (challenging the chief judge's order directing the expert to continue work on the case despite approving only partial payment of expert fees). Most importantly, the federal courts have concluded that, based on the statutory authority granted to the chief judge, a determination by the chief judge can only be challenged by seeking reconsideration with the chief judge or by writ of mandamus in the United States Supreme Court. *Obasi*, 435 F.3d at 852 (citing *United States v. D'Andrea*, 612 F.2d 1386, 1387–88 (7th Cir. 1980)); *Snarr*, 704 F.3d at 404 (citing *D'Andrea*, 612 F.2d at 1387–88); *Marcum*, 670 F.3d at 638 (citations omitted).[11]

Even though the federal courts were most often concerned about jurisdiction, these cases show how the federal courts view indigent requests for expert funding under the CJA and the virtual lack of review of the chief judge's administrative decisions. None of the cases cite due process or other constitutional concerns regarding review of the chief judge's decisions. Instead, the federal courts appear to be satisfied with the extraordinary remedy of writ of mandamus in the United States Supreme Court.

From our review, we conclude that due process does not require appellate review of an administrative funding decision of the AOC Director or the Chief Justice. By statute and Rule 13, the administration of the funds is within the discretion of this Court. The statutory authorization to promulgate rules to administer the limited pool of funds implies the Legislature was aware that any rules so promulgated would necessarily consider the availability of state revenues. In instances in which expert or other funds authorized by a post-conviction court are denied by the AOC Director, Rule 13, section 5(e)(5) provides for automatic review of the Director's denial by the Chief Justice. The decision is administrative and budgetary in nature, requiring the balancing of overall limitations on available funds against current pending requests for funds and future requests projected for the remainder of the fiscal year. The Petitioner cites no authority, and we find none, holding that due process requires allowing an "appeal" of an administrative and budgetary decision that necessarily involves multiple competing requests for funds for statutory post-conviction proceedings. We conclude that the Petitioner is not denied his rights to due process by the lack of appellate review of administrative funding decisions.

Even though there is no review of the reasons for the administrative funding decisions, the effects of those decisions are subject to review.[12] Due process in the post-conviction context merely requires that "the [petitioner] have 'the opportunity to be

---

[11] Marcum unsuccessfully pursued a petition for a writ of mandamus in the United States Supreme Court. *See In re Marcum LLP*, 565 U.S. 1195, 1195 (2012).

[12] *See Snarr*, 704 F.3d at 404–06 (considering whether, as a result of the chief judge's order reducing or denying expert funds, the defendant lacked the funds necessary to present an adequate defense and was therefore denied due process). Due process considerations are much greater before conviction.

heard at a meaningful time and in a meaningful manner.'" *Stokes v. State*, 146 S.W.3d 56, 61 (Tenn. 2004) (quoting *House v. State*, 911 S.W.2d 705, 711 (Tenn. 1995)). A full and fair hearing requires only "the opportunity to present proof and argument on the petition for post-conviction relief." *House*, 911 S.W.2d at 714; Tenn. Code Ann. § 40-30-106(h) ("A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence."). Thus, review of the effects of the denial of expert funds affords the petitioner due process consistent with post-conviction proceedings.[13]

Because the Petitioner has had an adequate appellate review of the due process concerns accompanying the denial of expert funds, we deny relief on this issue.[14]

*Full and Fair Post-Conviction Hearing*

Finally, we consider the Petitioner's claim that the denial of expert funds deprived him of a full and fair post-conviction hearing. Before we consider the adequacy of the evidentiary hearing, we revisit a brief portion of the factual and procedural history summarized in this Court's opinion on direct appeal to place the post-conviction issues in context. *See State v. Dotson*, 450 S.W.3d 1, 12–47 (Tenn. 2014).

A jury found that in March 2008, the Petitioner shot and killed his brother, his brother's fiancé, and their two friends inside his brother's home. *Id.* at 11–12. The Petitioner beat and stabbed five young children in the home because they witnessed the killings. *Id.* at 13–14, 25. Two of the children died, and the other three children survived due to medical intervention. *Id.* at 13, 23. Two of the surviving children identified the Petitioner as the killer. *Id.* at 24, 32. This identification led to the Petitioner's confession to the police and to his mother. *Id.* at 25–26. At trial, the State relied on the children's identifications and the Petitioner's confession along with other corroborating evidence. *Id.* at 20–33.

In his defense, the Petitioner presented evidence suggesting the killings and attempted killings were gang-related. *Id.* at 38. He also presented the testimony of a psychotherapist to cast doubt on the children's statements. *Id.* at 39–40. The Petitioner

---

[13] The Court of Criminal Appeals may not review the administrative funding decisions of the Chief Justice, but it is appropriate for the intermediate appellate court to review a petitioner's claim that he was denied a full and fair hearing on the stated post-conviction grounds because of the denial of expert funds. The Court of Criminal Appeals' judgment would be subject to review by this Court under Rule 11 of the Tennessee Rules of Appellate Procedure.

[14] The Petitioner also generally suggested that the Rule 13 provisions and/or the lack of an appellate remedy violate the state and federal prohibitions against cruel and unusual punishment. However, he has cited no authority supporting this argument.

testified as the final trial witness, telling the jury he was hiding under the bed when unknown assailants committed these killings. *Id.* at 40–41. Upon emerging from under the bed, the Petitioner discovered the victims' bodies and rode away on a bicycle. *Id.* at 41–42. He said he did not contact the police because he is a gang member, adding that gang members "don't call the police." *Id.* at 42.

The jury convicted the Petitioner of six counts of premeditated first-degree murder and three counts of attempted first-degree murder. *Id.* at 44. At the penalty phase, the State presented additional evidence to support the aggravating circumstances along with victim impact evidence. *Id.* The Petitioner offered the testimony of a mitigation specialist, who detailed the family history and background. *Id.* at 44–46. At the conclusion of the penalty phase, the jury sentenced the Petitioner to death for each of the first-degree murder convictions. *Id.* at 47. Following a separate sentencing hearing, the trial court sentenced the Petitioner as a Range II, multiple offender to forty years for each conviction of attempted first degree murder to be served consecutively to each other and to the death sentences. *Id.* at 47. This Court affirmed his convictions and sentences. *Id.* at 105.

The Petitioner sought post-conviction relief, raising several claims of ineffective assistance of counsel. As noted, he sought funds for expert witnesses to assist him in establishing certain ineffective assistance grounds. Not all of his requests were granted, and the Petitioner proceeded to the post-conviction hearing without the assistance of these experts. At the October 1 through 4, 2018 evidentiary hearing, the Petitioner presented testimony from lead counsel, co-counsel, Rachael Geiser (licensed private investigator), Glori Shettles (mitigation specialist), Dr. Marilyn Miller (expert in crime scene reconstruction, forensic science, and serology), and Deputy Carlos Atkins. The State presented testimony from Deputy Keley Gray and Assistant District Attorney General Ray Lepone. The Petitioner did not testify at the hearing. The post-conviction court denied post-conviction relief in a 109-page order.

Although there was a multi-day hearing, the Petitioner contends he was denied a full and fair evidentiary hearing. A full and fair post-conviction hearing occurs when a petitioner is given the opportunity to present proof and argument on the grounds raised in the petition for post-conviction relief. *See House*, 911 S.W.2d at 714. Thus, when a petitioner asserts he has been denied a full and fair hearing due to the denial of expert funds, he should identify the grounds for post-conviction relief he was either unable to present or unable to fully and fairly present at the hearing without the assistance of the desired experts. This specificity allows the court to identify the grounds, assess the available evidence relevant to those grounds, and consider whether the absence of the desired expert denied the petitioner a full and fair hearing on those grounds.[15]

---

[15] This same specificity is useful in establishing particularized need for funds in the post-conviction court.

Here, the Petitioner failed to clearly identify and support with argument the post-conviction grounds he was unable to fully and fairly present at the evidentiary hearing without expert assistance. Such failures typically result in waiver. However, we have chosen as part of our broader review of the post-conviction hearing to examine a particular ground of ineffective assistance of counsel that was raised in the petition and considered by the post-conviction court to which expert testimony from Dr. Merikangas and Dr. Leo could conceivably have been relevant.

As this Court has explained, the Petitioner had the burden of establishing his factual allegations by clear and convincing evidence. *Phillips v. State*, 647 S.W.3d 389, 401 (Tenn. 2022) (citing Tenn. Code Ann. § 40-30-110(f) (2018 & Supp. 2020)). As the Court explained in *Phillips*:

> The post-conviction court, under the guidance of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), then analyzes the facts to determine whether counsel's performance was deficient and whether that deficiency prejudiced the petitioner. *Nesbit v. State*, 452 S.W.3d 779, 786–87 (Tenn. 2014). Counsel's representation is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Deficiency alone, however, does not warrant automatic relief. *See id.* at 692, 104 S.Ct. 2052. A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The petitioner must prove sufficient facts to support both the deficiency and prejudice prongs of the *Strickland* inquiry—or, stated another way, the post-conviction court need only determine the petitioner's proof is insufficient to support one of the two prongs to deny the claim. *Mobley* [*v. State*], 397 S.W.3d [70] at 80 [(Tenn. 2013)].

*Id.*

In his amended petition, the Petitioner alleged his trial counsel were ineffective for failing to obtain or properly utilize expert assistance in the guilt and penalty phase investigations. This ground focused on trial counsel's choice of mental health experts and false confession expert and was primarily developed through the testimony and cross-examination of lead counsel and co-counsel. The testimony revealed that, after trial counsel learned the Petitioner had certain deficits, they explored whether the deficits could be used to challenge the voluntariness and reliability of his statements or otherwise

configure into defense theories. To that end, trial counsel retained Dr. Geraldine Bishop, a psychologist, Dr. Walker, a neuropsychologist, and Dr. Leo, a false confessions expert.

Dr. Bishop conducted a psychological evaluation but could not support a mental health defense. Dr. Walker conducted neuropsychological testing and issued a report finding the Petitioner competent to stand trial and concluding there was no viable insanity defense. Dr. Walker diagnosed the Petitioner under Axis I with adjustment disorder with depressed and anxious mood, alcohol dependence, cannabis dependence, and cognitive disorder not otherwise specified; under Axis II with antisocial personality characteristics; and under Axis IV with current psychosocial stressors of incarceration and legal problems. Dr. Walker also identified several mitigating factors.[16]

The Petitioner's trial counsel did not call Dr. Bishop as a witness and decided against calling Dr. Walker due to his findings of the Petitioner's antisocial personality characteristics. Trial counsel viewed antisocial personality as "one of the more dangerous labels in the criminal justice systems" because this type of diagnosis does not result in as much empathy or sympathy as other more serious mental health diagnoses. Trial counsel felt strongly that such a diagnosis should not be presented to the jury. Likewise, although counsel characterized the mitigation evidence identified by Dr. Walker as helpful, counsel chose not to present this evidence for the same reasons.

Dr. Leo was retained to assess the voluntariness and reliability of the Petitioner's confessions to the police and to his mother. Dr. Leo's assessments were based on a handwritten version of the events prepared by the Petitioner and on video excerpts of his confession that had been recorded and broadcast as part of *The First 48* television program.[17] Trial counsel was unable to obtain the entire footage recorded by the film crew. Trial counsel described the Petitioner's statement as "bad" but described the available portion of the recorded and broadcast statement as "much worse." Counsel suspected the unedited version of the statement was even worse. As a result, counsel made it a priority to prevent the admission of *The First 48* recordings and convinced the trial court to exclude the recordings in their entirety with the understanding that the recordings could be admissible if counsel opened the door to them through Dr. Leo's testimony. Trial counsel

---

[16] The mitigating factors included physical abuse suffered by the Petitioner as a child, the violent neighborhood in which he was raised, his brother's violent history and intoxication on the night of the murders, the Petitioner's significant academic difficulties and verbal learning problems, the family's neglect of him as a child, his prior criminal history, his intoxication on the night of the murders, and his chances of being a violent adult based upon genetic testing and the abuse he suffered as a child.

[17] The proof established that *The First 48* filmed criminal investigations under a contract with the police. As part of filming the investigation in this case, the crew recorded the Petitioner's confession, which was broadcast on the television program.

weighed the value of Dr. Leo's purported testimony and concluded Dr. Leo's opinion was not particularly helpful and could open the door to the admission of the recorded confessions from *The First 48* program. For these reasons, trial counsel decided not to call Dr. Leo as a witness.[18]

As to this ground of ineffective assistance, the post-conviction court accredited the testimony of Petitioner's trial counsel and determined that not using psychological evidence from Dr. Walker due to the antisocial diagnosis was a strategic decision. The court concluded that the Petitioner did not carry his burden of proof on both prongs of his ineffective assistance claim. As to the decision not to utilize Dr. Leo, the court again found that the Petitioner failed to carry his burden of proof on both prongs of ineffective assistance.

The Petitioner sought to retain Dr. Merikangas, a psychiatrist, to assist in establishing that trial counsel were ineffective for failing to utilize Dr. Walker and Dr. Leo and for failing to obtain the services of a psychiatrist. The post-conviction court accredited the testimony of trial counsel regarding its tactical reasons for not utilizing Dr. Walker or Dr. Leo. The evidence does not preponderate against those findings. The proof established that trial counsel investigated possible defenses through Dr. Walker and Dr. Leo and thoughtfully evaluated the results before deciding not to call either witness at trial. Giving deference to counsel's strategy, the decision not to use Dr. Walker and Dr. Leo for the reasons explained was sound and well-informed. *See House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) ("The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based on adequate preparation." (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996))); *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). It seems unlikely that any testimony from Dr. Merikangas would alter this conclusion.

As to the additional ineffective assistance ground that trial counsel were ineffective for failing to obtain the services of a psychiatrist, the Petitioner argues that under *Ake v. Oklahoma*, 470 U.S. 68 (1985), he was constitutionally entitled to the services of a psychiatrist at trial to assist in his defense and to develop mitigation evidence related to mental health. The Petitioner's reliance on *Ake* is misplaced. In *Ake*, the United States Supreme Court held that when a criminal defendant makes a preliminary showing that his

---

[18] Dr. Walker's report discussed the Petitioner's claim that his confessions were coerced. Although Dr. Walker identified factors consistent with a false confession claim, Dr. Walker described the Petitioner as not easily led or influenced by others. Counsel decided these remarks provided another reason not to call Dr. Walker.

sanity at the time of the offense is likely to be a significant factor in his defense *at trial*, due process requires the State to assure the defendant access to a competent psychiatrist to conduct "an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83. Here, Dr. Walker specifically determined that the Petitioner did not have a viable insanity defense. Therefore, the *Ake* requirement was never triggered.

Nonetheless, the post-conviction court granted prior authorization for the services of Dr. Merikangas, a psychiatrist. It appears from the ex parte motion that the Petitioner planned to utilize Dr. Merikangas to establish that trial counsel failed to investigate and present available mental health defenses and mitigation evidence. In our view, because the *Ake* requirement is inapplicable, Dr. Merikangas's opinion would have been irrelevant on the issue of whether counsel were ineffective for failing to obtain a psychiatrist. Further, it appears the Petitioner was seeking a second opinion from Dr. Merikangas on available mental health defenses and any related mitigation evidence. As explained, trial counsel retained competent mental health professionals and reasonably relied on the opinions of those experts. Counsel's informed reasons for choosing not to present the defense are virtually unassailable. *See Strickland*, 466 U.S. at 690. Thus, we conclude the Petitioner has failed to show that the absence of Dr. Merikangas's testimony denied the Petitioner a full and fair hearing on this ineffective assistance claim. Accordingly, the Petitioner's claim is without merit.

Having reviewed the post-conviction proceedings in their entirety and the opinion of the Court of Criminal Appeals, we conclude the Petitioner was not deprived of a full and fair post-conviction hearing.

## CONCLUSION

We hold the provisions of Rule 13 for prior approval review are constitutional, as applied; the Petitioner was not unconstitutionally denied appellate review of the denial of his request for expert funds; and the Petitioner was not deprived of a full and fair post-conviction hearing due to the denial of expert funds. We affirm the judgments of the post-conviction court and the Court of Criminal Appeals on the separate grounds stated herein. Costs are taxed to the State of Tennessee based on the Petitioner's indigency.

_____
SHARON G. LEE, JUSTICE